UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 17-50337 |
| | ) | |
| Plaintiff-Appellee, | ) | D.C. No. 3:14-cr-0388-MMA |
| | ) | Southern District of California, |
| v. | ) | San Diego |
| | ) | |
| RAVNEET SINGH, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| _____ | ) | |

**MOTION FOR BAIL PENDING APPEAL UNDER FEDERAL RULE OF**

**APPELLATE PROCEDURE 9(b) AND CIRCUIT RULE 9-1.2**

TODD W. BURNS
Burns & Cohan, Attorneys at Law
1350 Columbia Street, Suite 600
San Diego, California 92101
Telephone: 619-236-0244

Attorneys for Ravneet Singh

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

OVERVIEW OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

THE FEDERAL GOVERNMENT EXCEEDED ITS
CONSTITUTIONAL AUTHORITY WITH RESPECT TO
LOCAL ELECTIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

INVALID THEORY OF §1519 LIABILITY – SINGH DID
NOT FALSIFY ANYTHING, AND HAD NO DUTY TO
MONITOR THE CAMPAIGNS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CERTIFICATE REGARDING TRANSCRIPTS. . . . . . . . . . . . . . . . . . . . . . . . . 21

Certificate of Service

# TABLE OF AUTHORITIES

**FEDERAL CASES** *Page*

*Dunn v. Blumstein*,
    405 U.S. 330 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*McCutcheon v. FEC*,
    134 S. Ct. 1434 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Minor v. Happersett*,
    88 U.S. 162 (1874). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Oregon v. Mitchell*,
    400 U.S. 112 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Pope v. Williams*,
    193 U.S. 621 (1904). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Printz v. United States*,
    521 U.S. 898 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Sugarman v. Dougall*,
    413 U.S. 634 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11

*United States v. Avila-Anguiano*,
    609 F.3d 1046 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Causey*,
    835 F.2d 1289 (9th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Fulbright*,
    105 F.3d 443 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Gardenhire*,
  784 F.3d 1277 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Haeng Hwa Lee*,
  602 F.3d 974 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Handy*,
  761 F.2d 1279 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

*United States v. Kuok*,
  671 F.3d 931 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Laurienti*,
  611 F.3d 530 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Lazarenko*,
  564 F.3d 1026 (9th Cir.2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Lopez*,
  514 U.S. 549 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

*United States v. Mohrbacher*,
  182 F.3d 1041 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Norman*,
  87 F. Supp. 3d 737 (E.D. Pa. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Reese*,
  92 U.S. 214 (1875) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

*United States v. Stein*,
  37 F.3d 1407 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Yates v. United States*,
  135 S. Ct. 1074 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**FEDERAL STATUTES**

2 U.S.C. §441e(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. §2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 17, 18

18 U.S.C. §1519. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. §3143. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 20

**FEDERAL RULES**

Fed. R. App. P. 9. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Ninth Cir. Rule 9-1.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**MISCELLANEOUS**

*Judicial Business of the United States Courts,*
    *2016 Annual Report of the Director*, Table B-4A at 1 (2016). . . . . . . . . . . 20

S.D. Muni. Code §27.2930. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

## INTRODUCTION

Ravneet Singh is a forty-five year old United States citizen. In 2000 he founded ElectionMall, a Washington, D.C.-based company that provides social media services to campaigns for elective office. In 2016, after a twenty-four day trial and six days of jury deliberations, Singh was convicted of four counts relating to his providing social media services to two of the 2012 campaigns for San Diego mayor. The district court sentenced Singh to fifteen months custody and denied bail pending appeal. *See* 9/22/17 RT at 23; CR 807 (judgment).[1] Singh requests that this Court grant bail.

Bail pending appeal is warranted if a defendant shows he is not a flight risk or danger to the community and "(B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in . . . (ii) an order for a new trial . . . or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process." 18 U.S.C. §3143(b)(1); Fed. R. App. P. 9(c). The district court found that Singh is not a flight risk or a danger to the community and remarked about Singh's good character, reflected in dozens of letters submitted to the court. *See* 9/22/17 RT at 3; CR 781 (Singh's sentencing memorandum). But the court denied bail because it concluded

---

[1]     RT denotes reporter's transcript and CR denotes the district court clerk's record.   A transcript of the September 22, 2017 bail hearing and a copy of the judgment are being filed with this motion, as required by Federal Rule of Appellate Procedure 9(b) and Ninth Circuit Rule 9-1.2(a).

that Singh's appeal will not raise a "substantial question" that is likely to result in the types of relief mentioned in §3143(b)(1).  *See* 9/22/17 RT at 3-8.

To satisfy the "substantial question" standard Singh must only show that his appeal will raise an issue that is "fairly debatable," meaning "not frivolous."  *See United States v. Handy*, 761 F.2d 1279, 1280, 1283 (9th Cir. 1985).  An issue may meet that standard because it is "novel," or because "there is a school of thought, a philosophical view, a technical argument, an analogy, an appeal to precedent or to reason commanding respect that *might possibly* prevail."  *Id.* at 1281 (emphasis added).

As an initial matter, it bears noting that (1) the statutes involved in this case are not commonly charged, (2) the government's theories of liability are novel, (3) the Defendants raised many significant issues before and during the twenty-four day trial, and (4) many were issues of first impression.  Indeed, during the main pre-trial motion hearing the court remarked that the Defendants had filed a "mountain of paperwork" raising "significant issues" that required court staff to "pull[] a couple of all-nighters" *See* 7/17/15 RT at 5-6 (CR 173).  Given these circumstances, it would be surprising if there are no "substantial" issues presented in this appeal.  Indeed, although undersigned counsel was only recently appointed and has not had a chance to thoroughly review the record, it appears there are many substantial issues to choose

from on appeal. Two are discussed below, but first Singh provides an overview of the case.

## OVERVIEW OF THE CASE

The lead defendant (of four) is Jorge Azano Matsura. Azano is a Mexican citizen who has two homes in the San Diego area, a home in Miami, and business interests throughout the world. His wife and minor children are United States citizens, his children go to school in the San Diego area, and he is active in the San Diego community. Azano has been living in the United States on temporary visas rather than obtaining legal resident status, and thus is considered a "foreign national" under United States law. *See* CR 336 at 4 (third superseding indictment); 8/30/16 RT at 49-50, 66 (CR 583) (Singh's closing).

This case grew out of Azano's alleged efforts to gain influence with elected officials, and candidates, in San Diego because he hoped to have a sympathetic ear for his waterfront development plans. According to the government, in late 2011 Azano sought to support then District Attorney Bonnie Dumanis in her primary campaign for San Diego mayor. The government claimed that as part of that effort Azano recruited several "straw" donors to make contributions to Dumanis's campaign (donations Azano reimbursed), and provided funding for a political action committee (PAC) that supported Dumanis's campaign. After Dumanis placed fourth in the

mayoral primary in Spring 2012, Azano allegedly turned his focus to the general election mayoral campaign of Bob Filner. According to the government, Azano used a straw donor to make several large contributions to political committees and PACs that supported Filner's campaign. *See* CR 336 at 2-6, 9-13 (third superseding indictment); 8/30/16 RT at 4-5, 7, 25-26 (CR 449) (government closing).

The government did not claim that Singh played any role in Azano's alleged donations through straw donors. *See* 8/30/16 RT at 22, 28 (CR 583) (Singh's closing). Instead, the government's case against Singh was based on the following allegations: (1) through his company ElectionMall, Singh provided social media services to the Dumanis and Filner campaigns; (2) Azano paid Singh for those services; and (3) Azano thus made in-kind contributions to the campaigns, which he was prohibited from doing because he is a "foreign national" under 2 U.S.C. §441e(a) (now codified at 52 U.S.C. §30121). *See* CR 336 at 4, 8-9, 10, 12-13 (third superseding indictment). The specific charges against Singh are as follows.

Count 3 of the third superseding (and operative) indictment charged Singh with aiding and abetting unlawful campaign contributions by a foreign national under 2 U.S.C. §441e(a) and 18 U.S.C. §2(a). *See* CR 336 at 15 (third superseding indictment).

//

4

Counts 32 and 37 charged Singh with causing the filing of falsified documents under 18 U.S.C. §1519 and 18 U.S.C. §2(b). *See* CR at 17, 20, 21 (third superseding indictment). The government's theory on these counts was that Singh caused officials with the Dumanis and Filner campaigns to file campaign donation reports with the San Diego City Clerk's Office, and that those reports were false because they did not indicate the services that Singh provided to the campaigns, and thus also did not indicate that those services amounted to in-kind contributions from Azano. *See* 8/30/16 RT at 8-9, 16 (CR 449) (government closing). As will be discussed below, campaign officials filed those reports because they were required to do so under San Diego municipal law, and there is no evidence that Singh: (1) intentionally influenced, or even knew, what was in those reports; or (2) caused the filing of the reports, or even knew that they were filed. Thus, the government's (unprecedented) theory is that Singh had a duty to learn about the reports, monitor their accuracy, and force campaign officials to make any corrections or additions based on what he saw in the reports.

Count 1 charged a conspiracy to violate §441e(a) and §1519, which was based on the same theories underlying the substantive counts. *See* CR 336 at 7 (third superseding indictment); 8/30/17 RT at 9, 16 (CR 449) (government closing).

//

5

Singh now turns to discussing two of the substantive issues that will be raised on appeal.

## THE FEDERAL GOVERNMENT EXCEEDED ITS CONSTITUTIONAL AUTHORITY WITH RESPECT TO LOCAL ELECTIONS

The federal government has limited authority to regulate local elections. The government asserted that authority, with respect to all four counts of conviction, based on §441e(a)'s prohibition on foreign nationals making campaign contributions related to a "local election." *See* CR 144 at 18-19 (government opposition to motion to dismiss). This aspect of §441e is unconstitutional, arguably facially and certainly as applied to Singh. This is an issue of first impression, is substantial, and could lead to reversal of all four conviction counts. It thus supports granting bail.

Inherent in the Constitution is a system of "dual sovereignty" that was "rendered express" by the Tenth Amendment's statement that "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." *Printz v. United States*, 521 U.S. 898, 919 (1997). This Constitutional structure "was adopted by the Framers to ensure protection of our fundamental liberties." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) (internal quotation marks omitted); *see also United States v. Lopez*, 514 U.S. 549, 552 (1995).

//

6

The most fundamental power that the Constitution reserved for the States was "to establish and maintain their own separate and independent governments, except insofar as the Constitution commands otherwise." *Oregon v. Mitchell*, 400 U.S. 112, 124 (1970). This necessarily includes "the power to regulate [state and local] elections." *Id.* at 124-25.[2] Reservation of this power to the States was understood as a given, as reflected in Alexander Hamilton's statement in Federalist Number 59 (1788):

> Suppose an article had been introduced into the Constitution, empowering the United States to regulate the elections for the particular States, would any man have hesitated to condemn it, both as an unwarrantable transposition of power, and as a premeditated engine for the destruction of the State governments?

Of course, the States' power to regulate their elections may be encroached on by the federal government *if* there is Constitutional authority for that encroachment. For example, the Constitution provides some such authority with respect to the election of United States senators and representatives, *see* Article I, sections 2 and 4, and in Constitutional amendments prohibiting discrimination in voting. *See, e.g., Mitchell*, 400 U.S. 125-26. But specific grants of federal authority may "not be

---

[2] The *Mitchell* cites are to the opinion of Justice Black, which "announc[ed] the judgments of the Court in an opinion expressing his own view of the cases." 400 U.S. at 117. It is evident that the majority of justices took at least as narrow a view of the federal government's authority to regulate state and local elections as is reflected in Justice Black's opinion. *See, e.g., Sugarman v. Dougall*, 413 U.S. 634, 647 (1973).

stretched to nullify the States' powers over elections which they had before the Constitution was adopted and which they have retained throughout our history." *Id.* at 126.

The Supreme Court's opinion in *United States v. Reese*, 92 U.S. 214 (1875), illustrates the application of the principles stated in *Mitchell* in a criminal case. That case involved charges against two "inspectors of a municipal election" who were alleged to have "refus[ed] to receive and count . . . the vote of . . . a citizen of the United States of African descent." *Id.* at 215. The Court first addressed whether the charged statute could be read as applying only to an inspector who refuses to count a vote based on the voter's "race, color, or previous condition of servitude." *Id.* at 216. Such an anti-discrimination statute would be a permissible exercise of Congress's power under the Fifteenth Amendment. *See id.* at 218. But the Court held that because the statute charged was not "confine[d] . . . to unlawful discriminations on account of race, *etc.*," it was "unauthorized" and not "within the constitutional jurisdiction" of Congress to enact. *Id.* at 218, 220-21. The Court concluded that when Congress "steps outside of its constitutional limitations, and attempts that which is beyond its reach, the courts . . . must . . . annul its encroachments upon the reserved power of the States and the people." *Id.* at 221.

//

8

The same reasoning applies here: because there is no Constitutional provision that authorizes Congress or the federal government to regulate campaign contributions made in a local election, the application of §441e(a) in this case is unconstitutional. The government responds by asserting that there is no constitutional impediment to preventing foreign nationals such as Azano from participating in local elections, just as foreign nationals may permissibly be prevented from doing many things that a United States citizen is privileged to do. *See* CR 144 at 12-13 (government opposition to motion to dismiss).

The government's response misses the point. The issue is not whether a foreign national may be prohibited from participating in a local election without offending the Constitution. The issue is whether the federal – as compared to state or local – government may impose or enforce such a prohibition. And it is apparent, from the case law cited above, that the authority to do so rests exclusively with state and local governments, not the federal government. This conclusion is driven home when one considers that at the founding each state determined for itself who had the right to vote, and in many states that right was extended to those who were not citizens of that state or of the United States. *See Minor v. Happersett*, 88 U.S. 162, 172, 176-77 (1874). Even today many localities permit foreign nationals to vote in

//

local elections, *see* CR 112-1 at 14 (citations in defense motion to dismiss), a privilege over which those localities (or states) maintain exclusive control:

> The privilege to vote in any state is not given by the Federal Constitution, or by any of its amendments. It is not a privilege springing from citizenship of the United States. . . . [T]he privilege to vote in a state is within the jurisdiction of the state itself, to be exercised as the state may direct, and upon such terms as to it may seem proper, provided, of course, no discrimination is made between individuals, in violation of the Federal Constitution. The state might provide that persons of foreign birth could vote without being naturalized . . . . [T]he conditions under which that right is to be exercised are matters for the states alone to prescribe, subject to the conditions of the Federal Constitution . . . .

*Pope v. Williams*, 193 U.S. 621, 632-33 (1904), *overruled on other grounds by Dunn v. Blumstein*, 405 U.S. 330 (1972). If the eligibility of foreign nationals to vote in state and local elections is exclusively a state/local matter, it stands to reason that the eligibility of foreign nationals to make contributions related to such elections is also exclusively a state/local matter.

In opposition the government also argued that Congress is entitled to define the "political community" of the United States, and that choosing to exclude foreign nationals from that "political community" is within Congress's constitutional authority. *See* CR 144 at 10-13 (government opposition to motion to dismiss). Congress may have the authority to define and regulate the "political community" with respect to federal elections. But the Supreme Court has explicitly stated that it

10

is the States, not Congress, that have the power to define the "political community" with respect to state or local elections:

> We recognize a State's interest in establishing its own form of government, and in limiting participation in that government to those who are within 'the basic conception of a political community.' *Dunn v. Blumstein*, 405 U.S. 330, 344 (1972). We recognize, too, *the State's broad power to define its political community*.

*Sugarman v. Dougall*, 413 U.S. 634, 642-43 (1973) (emphasis added). *Sugarman* closed by reiterating that a State's "power to regulate elections" "inheres in the State by virtue of its obligation . . . 'to preserve the basic conception of a political community.'"[3] *Id.* at 647 (quoting *Dunn*, 405 U.S. at 344).

Singh now turns to the district court's treatment of this issue, which was first raised in a pre-trial motion to dismiss filed in July 2015. The court denied the motion, stating that "[s]ection 441e does not affect a direct regulation of state and local elections," and thus "does not overextend federal jurisdiction impermissibly to the conduct at issue in this case." CR 168 at 2 (court's tentative rulings); *see also* 7/17/15 RT at 23-24, 26-36 (CR 173 ) (motions hearing).

When the issue was raised again in a post-trial motion the court stated that there was no reason to reconsider its prior ruling. *See* CR 720 at 2 (court's tentative

---

[3]    In addition to the Constitutional imperative, it makes good sense that a local government, particularly in a closely-integrated border area, might permit foreign nationals to participate more fully in its local "political community" than Congress chooses to permit with respect to federal elections.

11

rulings). However, at the June 2, 2017 hearing the court arguably added something to its previous holding when it stated that "while it may be true that the federal government cannot directly regulate local elections, it's undisputed, *I guess*, that the federal government can regulate the activities of foreign nationals, and that's what this case *seems to be* all about here." *See* 6/2/17 RT at 22 (CR 836) (emphasis added); *see also id.* at 21-23, 31-32; CR 636, 649, 699 (Azano's post-trial motions for acquittal, Singh's motion for joinder, and order granting joinder). The equivocal "I guess" and "it seems" language highlights the substantiality of the issue.

At the September 22, 2017 hearing on Singh's motion for bail pending appeal the court did not address whether the constitutional issue raised here is sufficiently substantial to support bail pending appeal. *See* 9/22/17 RT at 11, 19-23; CR 824-1 at 19 (Singh's motion for bail). And the court's reasons for denying the motions for dismissal and acquittal based on this issue are infirm. With respect to the court's July 2015 statement that "[s]ection 441e does not affect a direct regulation of state and local elections," that is incorrect because: (1) section 441e explicitly prohibits certain contributions to state and "local election[s];" and (2) the Supreme Court has recognized the undeniable fact that contributions are the lifeblood of modern political campaigns and elections. *See, e.g., McCutcheon v. FEC*, 134 S. Ct. 1434 (2014). As for the court's post-trial statement that §441e does not offend the constitution because

it "regulate[s] the activities of foreign nationals" and not elections, that again ignores that the statute is explicitly directed at "local election[s]," and that regulation of such elections is an area reserved exclusively for the States, absent some explicit Constitutional authorization for federal intervention.

It is evident that the issue raised here is substantial, and that the government and district court have skirted, rather than addressed, it. Should Singh prevail on this issue it will lead to reversal of all four of his convictions. Thus the issue supports bail pending appeal.

## INVALID THEORY OF §1519 LIABILITY – SINGH DID NOT FALSIFY ANYTHING, AND HAD NO DUTY TO MONITOR THE CAMPAIGNS

The government's theory of Singh's liability under §1519 is invalid because Singh did not falsify anything, did not cause the campaigns to file inaccurate contribution reports, and had no duty to ensure the accuracy of those reports.

Section 1519 is titled, "Destruction, alteration or falsification of records in Federal investigations and bankruptcy," and states:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . . shall be fined under this title, imprisoned not more than 20 years, or both.

This prohibition was part of the 2002 Sarbanes-Oxley Act, which followed the

collapse of Enron. *See Yates v. United States*, 135 S. Ct. 1074, 1079 (2015). It was intended to target "corporate document-shedding to hide evidence of financial wrongdoing." *Id.* at 1081. In *Yates* the parties and Court agreed that §1519 was aimed at spoliation, or destruction, of evidence, the only issue being how broadly the statute reached in that regard. *See id.* at 1081, 1083.

The government's theory is that Singh violated §1519 when the Dumanis and Filner campaigns filed campaign contribution reports with the San Diego City Clerk's Office that did not list Singh's services as in-kind campaign contributions from Azano. *See* 8/30/16 RT at 8-9, 16 (CR 449) (government closing argument). Given what the Supreme Court said about the reach of §1519 in *Yates*, this is a doubtful theory of liability because the government did not allege that *anyone*, much less Singh, destroyed or altered any documents or records. In response the government has argued that a defendant may be held liable under §1519 based on failure to include, or omitting, information from a record or document. The district court agreed, and it was based on that agreement that the court found Singh could not raise a substantial appellate issue in this regard. *See* 9/22/17 RT at 4. But, as discussed below, whether a conviction under §1519 can be based on an omission is irrelevant to Singh's larger argument in this context.

//

For its omission argument the government relied primarily on *United States v. Norman*, 87 F. Supp. 3d 737 (E.D. Pa. 2015), a case in which police officers: (1) prepared reports that they had a duty to prepare; and (2) left out key information that falsely portrayed what had occurred. In arriving at its holding that an omission could support §1519 liability in that case, the district court made clear that it was pivotal that the officers had a duty to prepare the reports. The court in *Norman* also recognized that other courts that had endorsed §1519 omission liability likewise based their holdings on the defendants in those cases having a duty to report. *See id.* at 740-45. Thus, even if *Norman*'s omission theory of liability holding is correct – and *Yates*, which was decided two days after *Norman*, suggests that it is not – the key difference here is that Singh did not have a duty to prepare the campaign finance reports on which the government relied. *See* S.D. Muni. Code §27.2930 (indicating that campaign has obligation to file contribution reports); *see also* 7/27/16 RT at 23, 63 (CR 378) (government and defense openings); 8/10/16 RT at 18-19, 20-21 (CR 753) (testimony of Filner's campaign treasurer). Furthermore, there was no evidence that Singh even *knew* that the reports were required to be submitted, or were submitted, to the San Diego City Clerk's Office.

Thus the government's theory relies on Singh having a duty to (1) learn about the campaigns' contribution reporting requirements, (2) review any required reports, and (3) ensure that the reports were complete. That would be an astounding, and

legally unsupported, expansion of the obligations of vendors who provide services to campaigns.[4]  It is instructive to compare what is required when the government alleges that a defendant committed fraud by failing to disclose information.  This Court has been clear that for such a theory of liability to be valid the government must show that the defendant had a duty to disclose the information at issue.  *See, e.g., United States v. Laurienti*, 611 F.3d 530, 539 (9th Cir. 2010).  Surely no less can be required of a vendor that provides goods or services to a campaign.  Yet the government does not allege, and the evidence does not show, that Singh had a duty to ensure the accuracy of campaign donation reports filed with the San Diego City Clerk's Office.

The government's theory is especially dubious given that Singh's services were not being provided surreptitiously – campaign officials, including the campaign managers, were well aware of Singh's work on behalf of the campaign.  *See, e.g.,* 7/27/16 RT at 23 (CR 378) (government opening).  And, as mentioned above, it was the campaign officials who had a duty to report the services on the donation reports, not Singh.

//

---

[4]    Indeed, Singh's counsel expects that an industry trade-group will seek to file an *amicus* brief with this Court addressing exactly that point.

The government tries to get around these problems by relying on 18 U.S.C. §2(b), which states that "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." CR 826 at 5 (government opposition to bail pending appeal). The district court allowed the government to proceed with a §2(b) theory, instructing the jury:

> A defendant does not have to personally conceal an entry, cover up an entry, falsify an entry, or make a false entry, in a record or document. To prove a defendant guilty of falsification of records related to campaign finance, by causing the falsification of records, the government must prove beyond a reasonable doubt that a defendant willfully caused an act to be done which if directly performed by him or another would constitute the crime of falsification of records related to campaign finance.

CR 463 at 36-37 (jury instructions given).

The first problem with this theory – and thus also with the instruction and the sufficiency of the evidence – is that Singh did not cause the campaign finance reports to be filed. Those reports were filed by the Dumanis and Filner campaigns as required by a San Diego municipal ordinance. *See* S.D. Muni. Code §27.2930. There is not even evidence that Singh knew that the reports were filed, thus it is impossible to claim that he "caused" their filing.

There is a related flaw that becomes apparent when one considers that §2(b) imposes liability on a person who has the guilty intent to commit the charged offense

17

but uses an innocent, unwitting dupe to carry out the *actus reus*. *See, e.g., United States v. Causey*, 835 F.2d 1289, 1292 (9th Cir. 1987); *see also United States v. Haeng Hwa Lee*, 602 F.3d 974, 976 (9th Cir. 2010); *United States v. Mohrbacher*, 182 F.3d 1041, 1050 (9th Cir. 1999). Thus for §2(b) liability to apply the defendant must have intended to commit the offense charged, which here was submitting false reports. But there is absolutely no evidence that Singh knew what was in the charged reports, or even that those reports were filed, much less that he wanted the reports to be flied so that the crime of falsifying a record under §1519 would be committed. In short, there is no indication that Singh had the specific intent to commit a §1519 offense, and thus he could not be convicted of such an offense under §2(b).

Which leads to a related error in the jury instructions. To prove Singh guilty under a §2(b) theory the government was required to show that he acted willfully, meaning with the intent to violate §1519. The district court's willfulness instruction was more vague than that – it stated that the government merely had to show that Singh acted with "knowledge that some part of his course of conduct was unlawful and with the intent to do something the law forbids." CR 463 at 37 (jury instructions given). This reference to some vague unlawful intent is insufficient. Instead the government had to show that Singh intended a false report to be filed, in violation of law, and that he caused a false report to be filed to effect that intent. That is the thrust of §2(b) liability. Compounding the instructional error in this regard is that in the

very same instruction the court told the jurors that "[t]he government is not required to prove that the defendant knew that his acts or omissions were unlawful." CR 463 at 36 (jury instructions given). This conflicted with the wilfulness instruction and thus alone amounts to reversible error. *See United States v. Stein*, 37 F.3d 1407, 1410 (9th Cir. 1994).

Given these circumstances, the two substantive §1519 counts (counts 32 and 37) should be reversed because the government's theory of liability is invalid, the jury instructions are erroneous, and the evidence is insufficient. *See, e.g., United States v. Kuok*, 671 F.3d 931, 942 (9th Cir. 2012). Furthermore, reversal is required on the conspiracy count (count 1) because the government relied on its invalid "causing" theory to support the §1519 object of the conspiracy. *See* 8/30/16 RT at 9, 16 (CR 449) (government closing); *United States v. Fulbright*, 105 F.3d 443, 451 (9th Cir. 1997).

In addition, the erroneous "causing" theory undoubtedly had a spillover effect with respect to the §441e(a) conviction on count 3, and thus that, the final count, should also be reversed. *Cf. United States v. Lazarenko*, 564 F.3d 1026, 1043-44 (9th Cir.2009). That is because the jury was falsely led to believe that Singh had a duty to police the accuracy of the campaigns' donation reports, and thus the jury also likely believed that Singh had a duty to ensure that Azano was not making unlawful contributions.

19

But even if this issue only leads to reversal of three of the four conviction counts, that would unbundle the sentencing package and lead to a re-sentencing. *See United States v. Avila-Anguiano*, 609 F.3d 1046, 1049 (9th Cir. 2010). And at the bail hearing the court indicated a willingness to reconsider the sentence if the case dynamics were altered by the appeal, as it is legally required to do. *See id.*; 9/22/17 RT at 17-18; *United States v. Gardenhire*, 784 F.3d 1277, 1283-84 (9th Cir. 2015). Even a small reduction of Singh's fifteen-month sentence, which seems highly likely if three of the four counts are reversed, is significant because he received a sentence of fifteen months, and the average time for completion of an appeal in this Court is 14.7 months. *See Judicial Business of the United States Courts, 2016 Annual Report of the Director*, Table B-4A at 1 (2016).

Given these circumstances, it is likely that if Singh prevails on the issue identified here the result will be, at least, "a reduced sentence to a term of imprisonment less than the total of . . . the expected duration of the appeal process." 18 U.S.C. §3143(b)(1). Alternatively, there is a substantial likelihood that all four convictions will be reversed.

## CONCLUSION

Singh requests that the Court grant bail pending appeal.

Respectfully submitted,

Dated: October 3, 2017      */s/ Todd W. Burns*

20

## CERTIFICATE REGARDING DISTRICT COURT TRANSCRIPTS

Under Ninth Circuit Rule 9-1.2(b), a movant shall attach to the motion for bail pending appeal a certificate of the court reporter containing the name, address, and telephone number of the reporter who will prepare the transcript on appeal and the reporter's verification that the transcript has been ordered and that satisfactory arrangements have been made to pay for it, together with the estimated date of completion of the transcript.

On September 12, 2017, this Court issued an order requiring (1) Singh to order transcripts by October 2, 2017, and (2) the court reporters to file the transcripts by November 1, 2017. Mr. Singh's counsel filed a transcript designation and ordering form in the district court on October 2, 2017, indicating that he was designating and ordering transcripts of 54 proceedings (including 30 trial days), and for those proceedings there were six court reporters. *See* CR 835. Also on October 2, Singh's counsel ordered those transcripts through the district court's CJA evoucher system, as is required by the district court.

In light of these circumstances, Mr. Singh is unable to provide a single certificate for a court reporter who will prepare "the transcript on appeal," as indicated in the Ninth Circuit Rule 9-1.2(b). Accordingly, he requests that he be permitted to proceed on his counsel's certification that the transcripts for this case have been ordered, satisfactory arrangements for payment have been made under the Criminal Justice Act and district court procedures, and the estimated date of completion for all of the transcripts is November 1, 2017, per the Court's order. Should the Court deny this request, counsel will collect certificates from all of the court reporters involved.

Notably, several transcripts, or partial transcripts, were already produced throughout the proceedings. However, at this point undersigned counsel has not been able to determine the gaps in what has been previously ordered and produced, and he will not be able to make a complete assessment in that regard until all of the ordered transcripts have been produced.

Mr. Singh's counsel so swears, and certifies, under penalty of perjury.


Date: October 3, 2017                            */s/ Todd W. Burns*
                                                 Counsel for Appellant

21

**Certificate of Service When All Case Participants Are CM/ECF Participants**

I hereby certify that on October 3, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

 /s/   Todd W. Burns